**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| 1900 MARKET LLC and<br>ANODYNE HS GROUP, LLC,<br>Derivatively on behalf of<br>AMI EXPEDITIONARY HEALTHCARE<br>LLC,<br><br>       Plaintiffs,<br><br>v.<br><br>OMNIA LLC, VERITAS GLOBAL LLC,<br>RANDY COOK, CHRISTOPHER<br>WATSON, JOHN DOES (1-99), and ABC<br>CORPORATIONS (1-99), Said names being<br>fictitious for currently unidentified people or<br>companies involved in the foregoing matters,<br><br>       Defendants,<br><br>    and<br><br>AMI EXPEDITIONARY HEALTHCARE<br>LLC,<br><br>       Nominal Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

---

### STOCKHOLDER DERIVATIVE COMPLAINT

---

Plaintiffs 1900 Market LLC ("**1900 Market**") and AnodyneHS Group LLC ("**Anodyne**" and together, "**Plaintiffs**"), derivatively on behalf of AMI Expeditionary Healthcare LLC ("**AMI Ex**"), file this Stockholder Derivative Complaint against Defendants Omnia LLC ("**Omnia**"), Veritas Global LLC ("**Veritas**"), Randy Cook ("**Cook**"), Christopher Watson ("**Watson**"), John Does (1-99) and ABC Corporations (1-99), as follows:

# I.  NATURE OF THE ACTION

1.      Cook and Watson were Chief Executive Officer and Chief Operating Officer, respectively, of AMI Global Assistance LLC ("**GA-US**"), a subsidiary company of AMI Ex. Cook also served as a director of GA-US.

2.      Despite their fiduciary responsibilities to GA-US and AMI Ex as officers and directors, Cook and Watson hatched a scheme to steal AMI Ex's significant investment in GA-US to benefit themselves.

3.      Specifically, Cook and Watson walled off GA-US's operations from AMI Ex by creating a subsidiary of GA-US, AMI Global Assistance Ltd. ("**GA-UK**" and together with GA-US, the "**Companies**"), without AMI Ex's authority to run GA-US's operations and provide less transparency to AMI Ex.

4.      Thereafter, Cook and Watson also stole the Companies' customers, employees, intellectual property and funds for use in their own separate companies, Omnia and Veritas.

5.      In addition, when leaving the Companies' employment, Cook and Waston deleted all of the Companies' data and information to prevent AMI Ex from benefiting from its investment in the Companies and to destroy any evidence of their wrongdoing.

6.      As a result of their actions, Plaintiffs now assert derivative claims on behalf of AMI Ex against Cook, Watson, Omnia and Veritas for the significant damages AMI Ex has incurred.

# II.  PARTIES

7.      1900 Market is a limited liability company organized under the laws of the State of Wyoming with a principal place of business at 300 Conshohocken State Road, Suite 570, West Conchohocken, Pennsylvania. 1900 Market has been an owner of AMI Ex since the company's inception in 2010.

8. Anodyne is a limited liability company organized under the laws of the State of Wyoming with a principal place of business at 810 H North Kalaheo Ave., Kailua, Hawaii. Anodyne has been an owner of AMI Ex since the company's inception in 2010.

9. Nominal Defendant AMI Ex is a Delaware limited liability company with a principal place of business at 12030 Sunrise Valley Drive, Suite 250, Reston, Virginia. AMI Ex provides medical services to international aid organizations, humanitarian concerns, the private sector and government agencies in a wide range of remote and challenging environments. AMI Ex's services range from health consultancies and deployment of single-person aid posts and mobile clinics through to full-field hospitals and global aeromedical evacuation solutions. AMI Ex can provide people, facilities, equipment, consumables, pharmacy products, procedures, training, or any combination of these services depending upon the customer's needs, requirements and desired healthcare outcomes.

10. Omnia is a limited liability company organized under the laws of Tennessee with a principal place of business at 3200 West End Avenue, Suite 543, Nashville, Tennessee 37203.

11. Veritas is a limited liability company organized under the laws of Wyoming with a principal place of business at 424 Church St, Suite 2000, Nashville, Tennessee 37219.

12. Cook is an individual residing at 12649 Brighton Court, Mokena, Illinois 60448. Cook was the Chief Executive Officer and served on the Board of Directors of GA-US. Upon information and belief, Cook was the Chief Executive Officer and on the Board of Directors of GA-UK. Cook is also Chief Executive Officer of Omnia and Veritas. Cook's LLC, Dauntless Group LLC, owns 50% of the membership units of Omnia.

13. Watson is an individual residing at 1395 Sugar Flat Road, Lebanon, Tennessee. Watson was the Chief Operating Officer of GA-US. Upon information and belief, Watson was the

Chief Operating Officer of GA-UK. Watson is also Chief Operating Officer of Omnia and Veritas. Watson's LLC, Sahara Five LLC, owns 50% of the membership units of Omnia.

14.     Non-party AMI Global Assistance LLC (previously defined as GA-US) is a limited liability company organized under the laws of Wyoming with a principal place of business in Reston, Virginia. GA-US is a subsidiary of AMI Ex established on February 14, 2022 to build a global assistance business.

15.     Non-party AMI Global Assistance Ltd. (previously defined as GA-UK) is a company organized under the laws of England and Wales with a principal place of business at 30-32 Ludgate Hill London, EC4M 7DR United Kingdom. GA-UK is a subsidiary of GA-US established on April 21, 2022.

### III.     JURISDICTION AND VENUE

16.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because several of Plaintiffs' claims are federal questions. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

17.     Venue is appropriate in this Court because Omnia and Veritas' principal places of business are in this district and Watson is domiciled in this district. In addition, the injuries and damages described herein arise directly out of and are related to Defendants' contacts and activities in this district.

### IV.     FACTS

**A.      AMI Ex Establishes GA-US With The Goal Of Building A Global Assistance Business But Cook And Watson Refuse To Provide Any Information About The Companies And Take Steps To Separate Them From AMI Ex.**

18.     In or around February 14, 2022, AMI Ex established GA-US to build a global assistance business and enter that market.

4

19.     Andrew Walker, AMI Ex's Chief Executive Officer, appointed Cook as Chief Executive Officer of GA-US and Watson as Chief Operating Officer of GA-US.

20.     In or about 2022, the Board of GA-US was comprised of Dr. Thomas Crabtree as Chairman, Jack Walker as Vice Chair, Cook, Andrew Walker, Christine Joseph and Aaron Pait.

21.     For over a year, GA-US demanded $200,000-$500,000 per month in funding from AMI Ex.

22.     GA-US, led by Cook and Watson and shielded by Andrew Walker, however, refused to provide 1900 Market, Anodyne or AMI Ex's management team with information about GA-US' business or how GA-US was using AMI Ex's operating income.

23.     For example, 1900 Market, Anodyne and AMI Ex's management team requested financial information from GA-US, information relating to contracts GA-US executed with clients or software developers, and information about GA-US's projections and pipeline, yet Cook and Watson refused to provide that information.

24.     To create even less transparency, Cook and Watson spearheaded a movement with Andrew Walker to wall off GA-US's operations from AMI Ex without AMI Ex's knowledge or approval.

25.     For example, in or about April 2022, Andrew Walker and Cook created GA-UK to further obfuscate GA-US's operations from AMI Ex.

26.     Andrew Walker named Cook as Chief Executive Officer of GA-UK and Watson as Chief Operating Officer of GA-UK.

27.     Andrew Walker initially named himself as the sole director of GA-UK and added Cook as a director of GA-UK at a later date.

5

28.     To further wall off the Companies from AMI Ex, in or about January 2023, Cook and Watson directed the Companies to stop using AMI Ex's financial accounting system, which the Companies were not paying for, and switch to a new accounting system that the Companies paid for.

29.     This move caused AMI Ex to no longer have access to the Companies' accounting information.

30.     It also caused the already cash-strapped Companies to pay for an additional unnecessary expense.

31.     To further stonewall AMI Ex from information about the Companies, Cook and Watson directed the Companies to change insurance providers.

32.     Previously, the Companies obtained insurance under the same umbrella as AMI Ex and, as a result, obtained a cheaper rate, which AMI Ex paid for.

33.     Cook and Watson, however, directed the Companies to cancel their insurance with AMI Ex's provider and obtain separate insurance that the Companies paid for.

34.     This not only blocked AMI Ex from obtaining information from the Companies relating to insurance but also forced the Companies to spend money on an unnecessary expense.

35.     During this time, AMI Ex's management team, 1900 Market and Anodyne were also asking questions about the software development for the Companies.

36.     Cook and Watson, however, directed the Companies not to provide any information to AMI Ex's management team, 1900 Market and Anodyne regarding the Companies' relationship with the software developer, GatewayX.

37.     For example, the Companies refused to provide information about whether a contract existed between the Companies and GatewayX, the terms of such contract, how much the

Companies were paying GatewayX, what GatewayX was building for the Companies and who would own the Companies' intellectual property.

38.     The relationship between the Companies and GatewayX was extremely concerning to 1900 Market and Anodyne for at least three reasons.

39.     First, GatewayX was a new company and, therefore, AMI Ex's management team, 1900 Market and Anodyne wanted to ensure that GatewayX had sufficient capacity and knowledge to complete the work on behalf of the Companies.

40.     Second, Jack Walker, who was on the Board of GA-US and Andrew Walker's son, was also the Chief Executive Officer and 50% owner of GatewayX. Therefore, AMI Ex's management team, 1900 Market and Anodyne wanted to ensure that the terms of any deal between the Companies and GatewayX were at arm's length and in the best interests of the Companies.

41.     Finally, GatewayX's website indicated that it is a direct competitor of the Companies. Specifically, GatewayX advertises that it provides global travel assistance software and other services to clients around the world, which is precisely what the Companies did. Thus, GatewayX appears to be a competitor of AMI Ex and its subsidiaries. As a result, AMI Ex's management team, 1900 Market and Anodyne thought it was necessary to confirm whether the Companies' trade secrets were being provided to GatewayX, how they were protected and who owned the intellectual property of the Companies.

42.     Cook and Watson, however, refused to provide any information to AMI Ex, 1900 Market or Anodyne relating to the Companies' relationship with GatewayX and directed the Companies not to provide any information to AMI Ex's management team, 1900 Market or Anodyne relating to these issues.

43.     In addition, on or about February 16, 2023, Cook requested that GA-US's attorneys help protect GA-US from its parent by changing its registered agent from AMI Ex's counsel to another person and moving the company address from AMI Ex's headquarters in Reston, Virginia to Nashville, Tennessee.

44.     Anodyne's representative on the AMI Ex Board of Directors, Dr. Thomas Crabtree, was the Chairman of the Board of GA-US until October 2022 when Andrew Walker, Jack Walker and Cook removed him because he continued to question the creation of GA-UK, the direction of the Companies, the amount of funding AMI Ex provided, the Companies' lack of transparency, the competence of the Companies' leadership and the Companies' relationship with GatewayX.

45.     Although Andrew Walker, Jack Walker and Cook wanted Crabtree to completely resign from the Board, Crabtree refused and the two independent directors on the Board did not support removing him.

46.     As a result, Crabtree remained on the Board of GA-US.

47.     Nevertheless, Jack Walker, who was also the Chief Executive Officer of GatewayX, was appointed the new Chairman of GA-US.

**B.      The Companies Continue To Refuse To Provide Information Resulting In AMI Ex Refusing To Further Fund The Companies And The Companies Two Independent Board Members Resigning.**

48.     In or about March 2023, Jack Walker circulated a proposed resolution to the GA-US Board seeking to allow GA-US to allot and issue 10,000,000 shares in GA-UK without complying with the pre-emption rights in the GA-UK Articles of Association.

49.     This meant that Jack Walker sought to allow GA-US to issue an additional 10,000,000 shares in its subsidiary GA-UK without offering them first to AMI Ex as owner of the Companies.

8

50. Crabtree received this proposed Board Resolution and expressed his concern to the GA-US Board over the fact that AMI Ex would be significantly diluted if executed.

51. Crabtree stated, however, that he had not been provided with any financial information to justify the dilution and the GA-US Board never met to discuss any of the fiscal issues.

52. As a result, Crabtree requested that he be provided with GA-UK's financials to understand why GA-UK requires such a significant recurrent cash infusion.

53. He also requested GA-US's financial projections over the next 3-5 years and a detailed budget explaining how GA-UK plans to use the cash infusion.

54. Further, Crabtree requested to whom GA-UK plans to offer the shares.

55. Finally, he asked what other measures GA-UK has taken to raise funds other than through the issuance of shares and requesting money from AMI Ex.

56. Crabtree never received the information he requested regarding the Companies.

57. Nevertheless, in April 2023, Cook and Watson continued requesting that AMI Ex provide additional funding to the Companies or threatened to cease the Companies' operations.

58. Again, Crabtree and the AMI Ex Chief Financial Officer, Daniel Gilchrist, requested information to assess the Companies' request such as the Companies' financials and projections, the Companies' budget, including how much funding they need and how they plan to use it, an explanation of what other measures the Companies have taken to raise funds, the Companies' customer list and all agreements they have entered into, information relating to the Companies' intellectual property, among other information.

59. No one, however, provided the AMI Ex management team or Crabtree with any of the information requested regarding the Companies.

60.     Nevertheless, the issue of funding was continually raised at the GA-US Board meetings.

61.     Each time it was raised, Crabtree continued to request information regarding the financial status of the Companies.

62.     The two independent Board members of GA-US agreed with Crabtree that the Companies should provide more transparency.

63.     As a result, in or around mid-April 2023, the two independent Board members of GA-US, Christine Joseph and Aaron Pait, resigned from the Board, on information and belief, in part,because of the lack of transparency of the Companies to AMI Ex.

64.     As a result, the GA-US Board was left without a quorum and unable to act.

**C.     Without Funding, Cook And Watson Pivot To Starting Their Own Competing Company And Poaching The Companies' Employees, Clients And Confidential Information.**

65.     Rather than provide AMI Ex's management team, 1900 Market and Anodyne with the necessary information to obtain funding, Cook and Watson decided instead to establish a competing company, Omnia, using the Companies' resources and poaching the Companies' employees, clients and confidential information for their own use.

66.     To begin this plan, on or around February 21, 2023, Cook created a limited liability company under the laws of Illinois called Dauntless LLC.

67.     On February 22, 2023, Cook audaciously submitted an expense report to the Companies' Senior Finance Manager Frederick Jaum, which included the $806 in costs to establish Dauntless LLC.

68.     On February 27, 2023, the Companies paid Cook for his expense report in full, including the costs to set up his personal company, Dauntless LLC.

69.     Thus, Cook forced the Companies—using AMI Ex's money—to pay for the establishment of his own personal company he used to compete with the Companies.

70.     Thereafter, on March 16, 2023, Cook directed GA-US's Head of Administration, Gina Ross, who is also Cook's sister, to set up a new company in Tennessee named Omnia LLC.

71.     Cook advised Ross that Omnia will be owned 50% by Dauntless and 50% by Sahara Five, a company owned and controlled by Watson.

72.     On or about March 20, 2023, Ross created Omnia in Tennessee on behalf of Dauntless and Sahara Five.

73.     To further their plan, Cook and Watson poached the Companies' clients for their own company.

74.     For example, on or about May 11, 2023, Watson contacted the Companies' client, The Gates Foundation, to cancel its contract with the Companies and initiate a contract with Omnia.

75.     The Companies recorded approximately $76,000 year-to-date as of May 2023 from their contract with the Gates Foundation.

76.     Watson advised The Gates Foundation, however, that the Companies will "transition" to a new company, Omnia.

77.     Indeed, Cook and Watson sent The Gates Foundation a presentation, which falsely stated that "Omnia Global will take over as the new service provider, replacing AMI-GA."

78.     As a result, Watson recommended that The Gates Foundation not finalize the last stage of its current contract renewal with the Companies but rather sign a contract with Omnia.

79.     The Gates Foundation agreed because it believed that the Companies were shutting down.

80.     As a result, The Gates Foundation began contract negotiations with Omnia through Cook and Watson.

81.     Similarly, on May 15, 2023, Watson contacted the Companies' client, OMV, and advised that the Companies would be "shutting down" by May 31, 2023.

82.     The Companies recorded approximately $113,000 year-to-date as of May 2023 with their contract with OMV.

83.     Nevertheless, Watson advised OMV that all of the Companies' "team members will remain in their same roles as they transition to our new company." Watson then asked whether OMV is willing to discuss a contractual relationship with Omnia and promised to provide "support and the same level of service."

84.     Because OMV believed the Companies were shutting down, OMV agreed to cancel its contract with the Companies and replace it with a contract with Omnia.

85.     In response, Watson confirms that "[l]uckily with you onboard all of our clients are willing to follow us since they are shutting down."

86.     Next, Cook furthered his plan by stealing the Companies' intellectual property.

87.     On May 10, 2023, Cook emailed GA-UK's counsel requesting that counsel prepare documentation that would allow Cook and Watson to use the Companies' intellectual property in their "future endeavors." As an example, Cook said he wanted to make sure he could use the Companies' business development pipeline and quality management framework.

88.     Cook also requested that he be provided with rights and privileges to the Companies' trademarks for a period of five years following the Companies' dissolution. Specifically, he wanted to make sure that if anyone would "trade under the name AMI Global Assistance," that he would be able to file suit for trademark infringement.

89. Upon information and belief, Cook, Watson, Omnia and Veritas are using the Companies' intellectual property.

90. Thereafter, Cook and Watson embarked on poaching the Companies' employees.

91. For example, on or around May 19, 2023, Cook and Watson approached the Companies' employee, Sharon Solomon, about joining Omnia.

92. On May 21, 2023, Solomon responded to Cook and Watson via email by agreeing to join Omnia and set forth proposed terms of her employment.

93. Omnia's website also lists the Companies' former employee, Shelby Friedel, indicating Cook and Watson poached her too.

94. Not only did Cook and Watson poach the Companies' employees, customers and intellectual property, Cook and Watson also utilized the Companies' resources for their own use.

95. For example, Cook discussed with the Companies' Chief Marketing Officer, Samantha Young, during working hours ideas branding and logo selection for Omnia.

96. In addition, Omnia's website represents the Companies' clinic locations around the world as its own.

97. In particular, Omnia's website presents a map of its clinics, but those clinics have identical addresses to the Companies' clinics.

**D.** **Cook And Watson Delete The Companies' Data Without Permission Or Authority.**

98. As stated above, because Cook and Watson refused to provide any data about the Companies' operations, 1900 Market and Anodyne refused to continue providing the Companies with funding.

99. Rather than provide any information about the Companies, and because they created a competing business and stole the Companies' customers, employees and intellectual

property, Cook and Watson recommended that the Companies dissolve and cease operations representing that the Companies did not have sufficient revenue to continue operations.

100. As a result, the Companies ceased operations on or about June 1, 2023.

101. Before Cook and Watson left employment with the Companies, however, they instructed the Companies' information technology provider to wipe all information from the Companies' computers.

102. In addition, Cook and Watson deleted all of the Companies' electronic data, which was housed on the Companies' Microsoft 365 account.

103. Specifically, Cook and Watson deleted all of the Companies' users on the Companies' Microsoft 365 account and emptied all corresponding recycle bins.

104. In fact, the Companies' Microsoft Audit Logs show "triple deletion" of files in some instances, making them difficult—if not impossible—to recover.

105. Cook and Watson did not have permission or authority from AMI Ex to delete any of the Companies' files.

106. Indeed, the Companies are wholly owned by AMI Ex. Therefore, the decision to destroy those documents and information belonged to AMI Ex.

107. In fact, there is ongoing litigation relating to the Companies that Cook and Watson knew about that requires the Companies to preserve such data.

108. Cook and Watson, however, ignored any litigation hold or direction to preserve the Companies' data when deleting the Companies' electronic information.

**E.     Cook And Watson Get Tipped Off That AMI Ex Was Investigating Their Wrongdoing And Attempt To Divert Attention Away From Omnia By Creating Veritas.**

109.    On or about June 12, 2023, AMI Ex learned that the Companies' data had been unlawfully deleted and hired information technology consultants to retrieve as much information as possible from the Companies' Microsoft 365 account, among other things.

110.    From this review by the information technology consultants, AMI Ex learned that Cook and Watson created Omnia, a competing business, and stole the Companies' customers, intellectual property and employees.

111.    On June 22, 2023, the AMI Ex management team provided a preliminary report to the AMI Ex Board of Directors about the findings of the information technology consultants and recommended that AMI Ex send a cease-and-desist letter to Omnia, Dauntless Group LLC, Sahara Five LLC, Cook and Watson and to continue the investigation.

112.    Although Cook and Watson were not on that communication, they learned of it, upon information and belief, from Andrew Walker.

113.    As a result, the next day, on June 23, 2023, upon information and belief, Cook and Watson established Veritas in Wyoming to divert AMI Ex.

114.    Thereafter, Cook and Watson changed Omnia's website to indicate the name of the company changed from Omnia to Veritas.

115.    According to the site, Veritas provides all of the same services Omnia provided, has all of the same employees and all of the same clinics. Indeed, the only substantive change between the two sites is the name change from Omnia to Veritas.

**F.     <u>The Damage Done</u>**

116.    As a result of Defendants' actions, the Companies no longer operate and have no employees or customers.

117.    In addition, the AMI Ex management team, 1900 Market and Anodyne do not know whether the Companies own any intellectual property or whether an application was created.

118.    AMI Ex, 1900 Market and Anodyne cannot even review the Companies' electronic files to determine the status of the Companies' work because Cook and Watson deleted the files.

119.    All in, AMI Ex invested at least $4,407,493.42 in the Companies.

120.    As a result of Defendants' actions, however, AMI Ex's significant investment in the Companies to begin a global assistance business has been destroyed.

**G.    Demand On AMI Ex Was Futile.**

121.    Plaintiffs have been owners of AMI Ex's membership interests since the inception of the company.

122.    As a result, Plaintiffs will adequately and fairly represent the interests of AMI Ex in enforcing and prosecuting its rights and Plaintiffs have retained counsel experienced in litigating this type of derivative action.

123.    Plaintiffs did not make a demand on the AMI Ex Board to institute this action because pre-suit demand is futile.

124.    Demand is futile because there exists a reasonable doubt that only half of the Board at the time this Complaint was filed could properly exercise independent and disinterested business judgment in responding to a demand.

125.    Up until August 23, 2023, the demand Board had four members: Michael Asimos, Dr. Thomas Crabtree, Andrew Walker and Jack Walker. The Board has one additional Board seat that is vacant.

126.    On or about August 23, 2023, Andrew Walker's attorneys notified Anodyne and 1900 Market that it was replacing Jack Walker from AMI Ex's Board with Sasha Wyndham Walker, Andrew Walker's 24-year-old daughter.

127. Demand is futile if at least two of the four directors on the demand Board either lack independence, are not disinterested or both. Here, three of the directors—Andrew Walker, Jack Walker and Sasha Walker—are interested because they face a substantial likelihood of liability relating to the claims that are the subject of this suit and/or lack independence from someone who would face a substantial likelihood of liability on the claims that are the subject of this lawsuit.

128. Andrew Walker was on the Board of Directors of both GA-US and GA-UK and was the *de facto* leader of the management team of those entities.

129. The documents uncovered by AMI Ex's information technology consultants show that, in or about November 2022, Andrew Walker conspired with Cook to "spin off" the Companies from AMI Ex, without AMI Ex's knowledge or authority.

130. Specifically, in November 2022, Andrew Walker discussed with Cook the creation of GA-UK and walling off the Companies from AMI Ex.

131. In addition, he advised Cook, in advance of Cook creating the Companies' budget, that he hoped the Companies' budget for 2023 would be high so that Anodyne would be spooked and, therefore, encouraged to spin off the Companies.

132. Thereafter, for the next several months, Cook put into place the plan he formed with Andrew Walker, by creating GA-UK, hiring lawyers to "separate" the Companies from AMI Ex by changing GA-US' registered agent and headquarters, purchasing new accounting software and insurance to shield AMI Ex from the Companies' operations and refusing to provide information about the Companies to AMI Ex's management team, 1900 Market and Anodyne.

133. In addition, on May 10, 2023, Andrew Walker was copied on the email Cook sent to GA-UK's counsel requesting that Cook and others retain the Companies' intellectual property

rights. In fact, Cook specifically stated in that email that he and <u>Andrew Walker</u> sought to retain the intellectual property rights of the Companies.

134. Thus, the few documents that AMI Ex's information technology consultants were able to recover after Cook and Watson, in some instances, triple deleted such information evidence that Andrew Walker conspired with Cook and Watson to spin off the Companies from AMI Ex, shield any information from AMI Ex and keep the Companies' intellectual property for himself.

135. Finally, on or about May 15, 2023, Andrew Walker entered into a Management Services Agreement with Cook's company, Dauntless Group LLC, on behalf of GA-UK when the Companies were winding up without disclosing it to the AMI Ex Board or other shareholders. This agreement entitled Dauntless to approximately $20,000 per month in compensation plus 100% reimbursement of expenses, among other compensation.

136. As a result, it is clear that Andrew Walker faces a substantial likelihood of liability on the claims that are the subject of this suit.

137. Jack Walker was also on the Board of Directors of AMI Ex at all relevant times.

138. Jack Walker is Andrew Walker's son.

139. As Andrew's son, Jack has been appointed to the Board of Directors of AMI Ex and GA-US and served as Chairman of the Board of GA-US.

140. Jack does not have any specialized skills or knowledge that make him a good fit for these Boards other than the fact that he is Andrew's son.

141. In addition, Jack is a 50% owner and Chief Executive Officer of GatewayX, the software developer that the Companies hired to create the global assistance application.

142. As stated above, Cook, Watson, Andrew Walker and Jack Walker refused to provide the AMI Ex management team, 1900 Market and Anodyne any information about the

relationship between GatewayX and the Companies, including but not limited to the contract terms, what GatewayX was creating for the Companies, who would own the intellectual property, how much GatewayX was getting paid, whether GatewayX had any experience building such an application and whether GatewayX was a competitor of the Companies, among other issues.

143. Thus, not only does Jack Walker lack independence from Andrew Walker, someone who would face a substantial likelihood of liability on the claims herein, but Jack Walker also faces a substantial likelihood of liability on the claims herein based on his association with GatewayX.

144. Finally, Sasha Walker lacks independence from Andrew Walker and Jack Walker being that she is Andrew's daughter and Jack's sister and owes her appointment on the Board of AMI Ex to her father, Andrew.

145. Sasha, who is 24 years old, does not have any specialized skills or knowledge that make her a good fit for the AMI Ex Board other than the fact that she is Andrew's daughter.

146. Thus, Sasha Walker lacks independence from Andrew Walker and Jack Walker, both of whom could face a substantial likelihood of liability on the claims herein.

147. As a result, demand on the AMI Ex Board was futile.

## V. CLAIMS

### A. COUNT I: Breach of Fiduciary Duty (Against Cook and Watson)

148. Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

149. As officers of the Companies, Cook and Watson owed the Companies and AMI Ex fiduciary duties.

150. In addition, as a director of the Companies, Cook owed the Companies and AMI Ex fiduciary duties.

151.   Cook and Watson, however, breached their fiduciary duties to the Companies and AMI Ex by the conduct set forth above, including but not limited to stealing the Companies' intellectual property, customers and employees, using the Companies' money to create competing businesses, spoliating the Companies' documents and information and refusing to provide information to AMI Ex's management team, 1900 Market and Anodyne.

152.   As a result of Cook and Watson's actions, AMI Ex has been harmed because the Companies have been forced to cease operations, the Companies have no customers or employees, AMI Ex does not have exclusive use of the Companies' intellectual property, AMI Ex cannot use the Companies' documents and information, and AMI Ex lost its significant investment in the Companies, among other things, in an amount to be determined at trial.

**B.    COUNT II: Violation of the Tenn. Trade Secrets Act, Tenn. Code Ann. 47-25-1701, _et seq_. and the Defend Trade Secrets Act, 18 U.S.C. 1836 (Against All Defendants)**

153.   Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

154.   The Companies had trade secrets, including but not limited to customer lists, sales strategy and tactics, proprietary information regarding pricing and billing records, knowledge of the Companies' customer needs, the Companies' products and services and other knowledge, forms and procedures used in the business.

155.   As an officer and director of the Companies, Cook had access to the Companies' trade secrets.

156.   As an officer of the Companies, Watson also had access to the Companies' trade secrets.

157. Defendants used the Companies' trade secrets to the detriment of the Companies by the conduct set forth above, including but not limited to stealing the Companies' trade secrets for their own use.

158. Defendants knew that Cook and Watson acquired the Companies' trade secrets through improper means.

159. As a result of Defendants' actions, AMI Ex has been harmed because the Companies have been forced to cease operations, the Companies have no customers or employees, AMI Ex does not have exclusive use of the Companies' intellectual property and AMI Ex lost its significant investment in the Companies, among other things, in an amount to be determined at trial.

C.    **COUNT III: Violation of the Lanham Act, 15 U.S.C. § 1125(a) (Against All Defendants)**

160. Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

161. Defendants passed off the Companies' services to the Companies' customers as being those of Omnia and/or Veritas by communicating to those customers that Omnia and/or Veritas had taken over the Companies' business and by misappropriating the Companies' confidential information.

162. Defendants' communications were false because Omnia and/or Veritas were not taking over the Companies' services.

163. Defendants' false or misleading representations of fact were material because they caused the Companies' customers to cease negotiating new contracts with the Companies and begin negotiating contracts with Omnia.

164. Upon information and belief, Omnia transferred its services to Veritas after Defendants learned that AMI Ex discovered Defendants' wrongful conduct.

165. As a result of Defendants' actions, AMI Ex has been harmed because the Companies have been forced to cease operations, the Companies have no customers or employees, AMI Ex does not have exclusive use of the Companies' intellectual property and AMI Ex lost its significant investment in the Companies, among other things, in an amount to be determined at trial.

**D.     COUNT IV: Violation of the Tenn. Consumer Protection Act, 47-18-101, *et seq*. (Against All Defendants)**

166. Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

167. By engaging in the conduct described above, Defendants have violated the Tennessee Consumer Protection Act, Tenn. Code Ann. 47-18-101, *et seq*., by intentionally and knowingly engaging in unfair and deceptive acts, including but not limited to passing off the Companies services to the Companies' customers as being those of Omnia and/or Veritas by communicating to those customers that Omnia and/or Veritas took over the Companies' business and by misappropriating the Companies' confidential information.

168. These communications were false because Omnia and/or Veritas were not taking over the Companies' services.

169. In doing so, Defendants caused misunderstanding or confusion regarding the Companies' business and services and their affiliation with Omnia and/or Veritas.

170. As a result of Defendants' actions, AMI Ex has been harmed because the Companies have been forced to cease operations, the Companies have no customers or employees, AMI Ex does not have exclusive use of the Companies' intellectual property and AMI Ex lost its

significant investment in the Companies, among other things, in an amount to be determined at trial.

**E.      COUNT V: Violation of Computer Fraud and Abuse Act, 18 U.S.C. 1030(a),** *et seq.* **(Against Cook and Watson)**

171.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

172.    Cook and Watson violated the Computer Fraud and Abuse Act, 18 USC 1030(a), when they accessed the Companies' Microsoft 365 account, the Companies' computers and the Companies other computer systems without authorization and/or in excess of their authorization by deleting the Companies' documents, information and emails, directing information technology professionals to delete the Companies' documents, information and emails and impaired AMI Ex's access to the Companies' documents, information and emails, among other things.

173.    As a result of Cook and Watson's conduct, AMI Ex could not access the Companies' important documents, emails and information and resulted in AMI Ex and the Companies being forced to spend over $5,000 conducting a damage assessment and restoring the data, systems and information affected by Cook and Watson's unlawful conduct. Cook and Watson's conduct also resulted in the interruption of the Companies' business.

174.    Cook and Watson have damaged AMI Ex within the meaning of the Computer Fraud and Abuse Act.

**F.      COUNT VI: Conspiracy to Breach Fiduciary Duty (Against All Defendants)**

175.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

176.    As an officer and director of the Companies, Cook owed fiduciary duties to the Companies and AMI Ex.

177.     As an officer of the Companies, Watson also owed fiduciary duties to the Companies and AMI Ex.

178.     While still employed by the Companies, however, Cook and Watson conspired together and with their companies Omnia and/or Veritas to steal the Companies' customers, employees, and funds for their own benefit, spoliate the Companies' documents and information to the detriment of the Companies and AMI Ex and refuse to provide the AMI Ex management team, 1900 Market and Anodyne any information about the Companies.

179.     Defendants conspired with each other to steal the Companies' information, customers, employees and funds and spoliate the Companies' documents and information to the detriment of the Companies and AMI Ex.

180.     As a result of Defendants' actions, AMI Ex has suffered significant damages in an amount to be determined at trial.

## G.     COUNT VII: Intentional Interference with Existing Or Prospective Business Relationship (Against All Defendants)

181.     Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

182.     The Companies had contracts with their customers.

183.     Cook and Watson were well aware of the Companies' contracts because they were negotiating renewal of those contracts with the customers.

184.     While Cook and Watson were working at the Companies, however, Cook, Watson, Omnia and Veritas intentionally and maliciously interfered with the Companies' customer contracts by convincing the Companies' customers to cease doing business with the Companies and instead conduct business with Omnia and/or Veritas in an effort to harm the Companies and AMI Ex.

185.    As a result of Defendants' actions, AMI Ex has suffered significant damages in an amount to be determined at trial.

**H.     COUNT VIII: Unfair Competition (Against All Defendants)**

186.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

187.    The Companies had contracts with their customers, including but not limited to The Gates Foundation and OMV.

188.    Cook and Watson were aware of the Companies' customer contracts because they were negotiating renewal of those contracts on behalf of the Companies.

189.    Defendants, however, intentionally and maliciously deprived the Companies of customers or other prospects by convincing the Companies' customers to cease doing business with the Companies and instead conduct business with Omnia and/or Veritas in an effort to harm the Companies and AMI Ex.

190.    As a result of Defendants' actions, AMI Ex has suffered significant damages in an amount to be determined at trial.

**I.     COUNT IX: Misappropriation of Corporate Funds (Against Cook)**

191.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

192.    As an officer and director of the Companies, Cook had access to the Companies' funds.

193.    Cook and Watson used the Companies' funds to the detriment of the Companies by the conduct set forth above, including but not limited to using the Companies' funds for their own use.

194.    As a result of Cook's actions, AMI Ex has been harmed in an amount to be determined at trial.

**J.    COUNT X:  Unjust Enrichment (Against All Defendants)**

195.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

196.    As an officer and director of the Companies, Cook had access to the Companies' customers, employees, information, and funds.

197.    As an officer of the Companies, Watson also had access to the Companies' customers, employees, information, and funds.

198.    Cook and Watson benefitted from the Companies' customers, employees, information and funds to the detriment of AMI Ex by the conduct set forth above, including but not limited to stealing the Companies' customers information for their own use through companies they either own or control including but not limited to Omnia and/or Veritas, using the Companies' funds for their own use and spoliating the Companies' documents and information.

199.    As a result of Cook and Watson's actions AMI Ex has been harmed because the Companies have been forced to cease operations, the Companies have no customers or employees, AMI Ex does not have exclusive use of the Companies' intellectual property and AMI Ex lost its significant investment in the Companies, among other things, in an amount to be determined at trial.

200.    It would be inequitable for the Defendants to retain the benefit they received from the Companies without payment of the value thereof.

**K.    COUNT XI: Conversion (Against All Defendants)**

201.    Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

202.     Cook and Watson used the Companies' information and funds to the detriment of the Companies and AMI Ex by the conduct set forth above, including but not limited to stealing the Companies' funds for their own use.

203.     As a result of Cook and Watson's actions AMI Ex has been harmed because the Companies have been forced to cease operations, the Companies have no customers or employees, AMI Ex does not have exclusive use of the Companies' intellectual property and AMI Ex lost its significant investment in the Companies, among other things, in an amount to be determined at trial.

**L.     COUNT XII: Permanent Injunction (Against All Defendants)**

204.     Plaintiffs repeat and re-allege the allegations contained above as if fully set forth herein.

205.     Cook, Watson, Omnia and/or Veritas stole the Companies' intellectual property and confidential information for their own benefit to the detriment of the Companies and AMI Ex, including but not limited to the Companies' trademarks, information about the Companies' applications and clients and information about AMI Ex's clinic locations.

206.     These actions caused AMI Ex significant damages, including but not limited to loss of their clients, employees and intellectual property and caused AMI Ex to cease the operations of the Companies.

207.     Serious and irreparable harm will result absent an injunction because it will result in Defendants continuing to use AMI Ex's intellectual property and confidential information.

208.     The equities are in Plaintiffs' and AMI Ex's favor because, among other reasons, Defendants purposefully stole AMI Ex's intellectual property. In addition, if the relief is granted, Defendants will merely lose the ability to continue profiting from their own wrongful conduct.

209. Plaintiffs and AMI Ex have no adequate remedy at law.

210. Accordingly, Plaintiffs respectfully request that the Court rule that Defendants cease using the Companies and AMI Ex's intellectual property and confidential information for their own benefit.

**WHEREFORE**, Plaintiffs respectfully request judgment and relief as follows:

a. For actual, compensatory and exemplary damages in favor of AMI Ex in an amount to be determined at trial;

b. All remedies provided under Tenn. Code Ann. 47-25-1701 et seq. including but not limited to all damages, attorney's fees and costs and remedies;

c. All remedies provided under 15 U.S.C. 1117(a), including but not limited to Defendants' profits, the actual damage sustained by AMI Ex and the Companies including impairment of AMI Ex and the Companies' goodwill, the costs of this action and reasonable attorney's fees;

d. All remedies and damages permitted under the Tennessee Consumer Protection Act;

e. All remedies and damages permitted under the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a), et seq.;

f. For the unjust enrichment of Defendants in favor of AMI Ex in an amount to be determined at trial;

g. For treble, statutory and/or punitive damages in favor of AMI Ex in an amount to be determined at trial;

h. For a permanent injunction to be issued against Defendants and in favor of AMI Ex to prevent Defendants from utilizing AMI Ex's intellectual property and confidential information;

28

i.  Awarding Plaintiffs attorney's fees, costs incurred in bringing this action and prejudgment interest; and

j.  Awarding such other and further relief as the Court may deem just and proper.

## VI.  <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

Respectfully submitted,

*/s/ Jeremey R. Goolsby*
Jeremey R. Goolsby, No. 34505
FROST BROWN TODD LLP
150 3rd Avenue South, Suite 1900
Nashville, TN  37201
615-251-5550 Telephone
615-251-5551 Facsimile
jgoolsby@fbtlaw.com

*Attorneys for Plaintiffs 1900 Market LLC*
*and Anodyne HS Group LLC*

0154821.0775710  4877-6220-6078