IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| 1900 MARKET LLC and ANODYNE HS GROUP, LLC, Derivatively on behalf of AMI EXPEDITIONARY HEALTHCARE LLC, | ) ) ) ) ) | NO. 3:23-CV-00954 |
| | ) | JUDGE RICHARDSON |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| OMNIA LLC, VERITAS GLOBAL LLC, RANDY COOK, CHRISTOPHER WATSON, JOHN DOES (1-99), and ABC CORPORATIONS (1-99), Said names being fictitious for currently unidentified people or companies involved in the foregoing matters, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| AMI EXPEDITIONARY HEALTHCARE LLC, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, 1900 Market LLC and Anodyne LLC, filed this so-called stockholder (or

shareholder) derivative action against Defendants Omnia LLC, Veritas Global LLC, Randy Cook,

and Christopher Watson, as well as an undefined number of John Does and ABC Corporations,[1]

---

[1] Plaintiffs refer to John Does (1-99) and ABC Corporations (1-99) to include an uncertain number of possible individuals or companies that may be involved with the foregoing matter. This Order will refer to these individuals only in the all-encompassing "Defendants" as they are not cited in any further documents (Doc. No. 18, 19, 24, or 28) considered in this Order.

("Defendants"), on behalf of the shareholders in Nominal Defendant AMI Expeditionary Healthcare LLC (Doc. No. 1, "Complaint").

Pending before the Court is Defendants' "Motion to Dismiss Plaintiffs' Stockholder Derivative Complaint" (Doc. No. 18, "Motion"), whereby Defendants seek dismissal of four particular counts contained in the Complaint under Fed. R. Civ. P. 12(b)(6)[2] for failure to state a claim upon which relief can be granted. Defendants support the Motion with a memorandum of law (Doc. No. 19, "Memorandum"). Plaintiffs responded with "Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Partially Dismiss Plaintiffs' Complaint" (Doc. No. 24, "Response"), and thereafter Defendants filed "Defendants' Reply to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Partially Dismiss Plaintiffs' Complaint" (Doc. No. 28, "Reply").

For the reasons stated herein, Defendant's Motion will be GRANTED IN PART AND DENIED IN PART.

<u>RELEVANT BACKGROUND</u>[3]

---

[2] In their Memorandum (Doc. No. 19), Defendants erroneously cite Tenn. R. Civ. P. 12.02(b) instead of the corresponding federal rule, Fed. R. Civ. P. 12(b)(6). This Order will refer only to the Federal Rules of Civil Procedure, and not to any Tennessee Rules of Civil Procedure.

[3] The facts contained herein come from the Complaint (Doc. No. 1). For purposes of the instant Motion and pursuant to the typical mechanisms of assessing motions under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the facts alleged in the Complaint as true, except to the extent that this Order qualifies them (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true (because, for example, they are not really facts at all but rather legal conclusions) but rather are set forth to indicate what Plaintiff *claims* to be true. Throughout this Order, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even with the awareness that any such alleged fact may ultimately prove false.

The parties are in agreement that this Court has both federal-question jurisdiction under 28 U.S.C. § 1331 (presumably only as to claims arising under federal law) and diversity jurisdiction under 28 U.S.C. § 1332. Because the citizenship of a limited liability company is the citizenship of *all* of its members, the parties are representing that there is complete diversity of citizenship between all owners of Plaintiff on the one hand and all owners of Omnia and Veritas (as well as Cook and Watson) on the other hand. The Court is not so sure that the record reflects that this is the case. However, even if jurisdiction over the state-law

### A. Background on Parties and Initial Organization of AMI-US and AMI-UK

Plaintiff 1900 Market LLC ("1900 Market") is a limited liability company organized under Wyoming law with its principal place of business in Pennsylvania. (Doc. No. 1 at ¶ 7). Plaintiff Anodyne LLC ("Anodyne") likewise is organized under Wyoming law but has its principal place of business in Hawaii. (*Id*. at ¶ 8).

Nominal Defendant AMI Expeditionary Healthcare LLC ("AMI Ex") is a Delaware limited liability company with its principal place of business in Virginia. (*Id*. at ¶ 9). Both 1900 Market and Anodyne have been owners in AMI Ex since AMI Ex's founding in 2010. (*Id.* at ¶¶ 7, 8). AMI Ex provides healthcare services to a wide array of industries in the public and private sectors and tailors those services to the individual needs of each of its clients. (*Id*.). Two subsidiaries of AMI Ex are relevant to this matter, though they are not parties to the action: (1) AMI Global Assistance LLC ("AMI-US"), formerly known as GA-US, a Wyoming limited liability company based in Virginia, established to "build a global assistance business" for AMI Ex; and (2) AMI Global Assistance Ltd. ("AMI-UK"), formerly known as GA-UK, a company organized under English and Welsh law with its principal place of business in London, England, and a subsidiary of AMI-US. (*Id*. at ¶¶ 14-16). (Herein, consistent with the terminology in the Complaint, (Doc. No. 1 ¶ 3, AMI-US and AMI-UK are referred to collectively as "the Companies").

Defendants Omnia LLC ("Omnia") and Veritas Global LLC ("Veritas") are limited liability companies involved in this dispute. (*Id*. at ¶¶ 10-11). Omnia is organized under Tennessee law with its principal place of business in Tennessee, and Veritas likewise maintains its principal place of business in Tennessee but is organized under Wyoming law. (*Id*.)

---

claims could not properly be premised on diversity of citizenship, it could be premised on so-called "supplemental" jurisdiction under 28 U.S.C. § 1367(a) because the same common nucleus of operative (alleged) facts underlies the federal claims and the state-law claims.

Defendant Randy Cook, a resident of Illinois, previously served as the Chief Executive Officer (CEO) and a member of the Board of Directors for AMI-US and, according to Plaintiffs, held the same roles at AMI-UK. (*Id.* at ¶ 12). Currently, Cook serves as the CEO of both Omnia and Veritas and owns Dauntless Group LLC ("Dauntless"), which controls 50% of Omnia's membership units. (*Id.*).

Defendant Christopher Watson, a resident of Tennessee, previously served as the Chief Operating Officer (COO) for AMI-US and AMI-UK.[4] (*Id.* at ¶ 13). He now serves as the COO of Omnia and Veritas and owns Sahara Fire LLC ("Sahara Fire"), which controls the remaining 50% of Omnia's membership units. (*Id.* at ¶ 13).

In mid-February 2022, AMI Ex established AMI-US to expand its global assistance business. (*Id.* at ¶ 18). AMI Ex's CEO, Andrew Walker, appointed Cook as CEO and Watson as COO of AMI-US. (*Id.* at ¶¶ 18-19). The AMI-US Board of Directors at that time included Dr. Thomas Crabtree (as Chairman), Jack Walker (as Vice Chair), Cook, Andrew Walker, Christine Joseph, and Aaron Pait. (*Id.* at ¶ 20). During its first year of operation, AMI-US allegedly "demanded" monthly funding from AMI Ex ranging between $200,000 and $500,000 to support its operations. (*Id.* at ¶ 21). Plaintiffs claim that AMI-US, under the direction of Cook and Watson, refused to provide AMI Ex with information regarding AMI-US's business dealings or AMI-US's actual or intended use of the funding. (*Id.* at ¶ 22). For instance, when Plaintiffs and AMI Ex prompted AMI-US to provide details on executed contracts with software developers (including

---

[4] The Court notes that Plaintiffs make their allegations regarding Cook's and Watson's respective former positions with AMI-UK only "upon information and belief." (Doc. No. 1 at ¶¶ 12, 13). However, the Court takes these allegations as true for the purposes of this Order, especially since they neither are implausible nor foster any internal inconsistency in Plaintiffs' allegations.

how and when AMI-US planned to use those relationships to benefit AMI Ex), Cook and Watson allegedly failed to provide the requested details. (*Id*. at ¶ 23).

## B. Unlawful Actions Continue, and the AMI-US Board Ceases to Function

In April 2022, Cook and Watson, joined in this instance by Andrew Walker,[5] allegedly furthered their efforts to distance AMI-US from its parent company by establishing AMI-UK, with Cook appointed as CEO, Watson as COO, and Andrew Walker as a board member. (*Id*. at ¶¶ 24-27). Andrew Walker later added Cook to the AMI-UK board. (*Id*. at ¶ 27).

As part of this strategy to separate the operations of AMI-US and AMI-UK from AMI Ex, Cook and Watson directed AMI-US to purchase a separate accounting system from the one provided by AMI Ex. (*Id*. at ¶¶ 28 – 30). Plaintiffs allege that this decision served to prohibit AMI Ex from directly accessing its subsidiaries' financial information, further obscuring the subsidiaries' operations. (*Id*. at ¶ 29). In addition to directing a change in AMI-US's accounting system, Cook and Watson directed AMI-US and AMI-UK to procure a different insurance provider, removing both businesses from the shared policy it had with its parent AMI Ex. (*Id*. at ¶¶ 31-33). Plaintiffs contend that this was done for the sole purpose of prohibiting them or AMI Ex from seeing any insurance transactions involving AMI-US or AMI-UK. (*Id*. at ¶ 34).

Around the same time, Plaintiffs and AMI Ex requested information about Defendants' dealings with GatewayX, a software development firm, which Cook and Watson forbade AMI-US or AMI-UK from sharing. (*Id*. at ¶¶ 35-36). In particular, Plaintiffs allege that they did not receive any information about "whether a contract existed between [AMI-US, AMI-UK,] and GatewayX, the terms of such contract, how much [AMI-US and AMI-UK] were paying GatewayX, what

---

[5] The Complaint implicates Andrew Walker and his son Jack in a few, but not all, of Cook and Watson's alleged actions against Plaintiffs. (Doc. No. 1). The Court herein will refer to the Walkers' (alleged) involvement for the sake of comprehensiveness, while noting that neither of the Walkers are a party to this lawsuit.

GatewayX was building for [AMI-US and AMI-UK] and who would own [AMI-US's and AMI-UK's] intellectual property." (*Id*. at ¶ 37). Plaintiffs further expressed concerns about the business relationship between AMI-US, AMI-UK, and GatewayX due to: GatewayX's relatively novel nature as a business; whether the contract resulted from the conflicting interest of AMI-US board member and GatewayX CEO Jack Walker; and whether the relationship should have existed in the first place since GatewayX competed in the same market as AMI-US and AMI-UK. (*Id*. at ¶¶ 37-41). Cook and Watson refused to divulge any information to Plaintiffs about this relationship and directed AMI-US and AMI-UK to not provide any information. (Doc. No. 1 at ¶ 42).

In February 2023, Cook asked attorneys representing both AMI-US and AMI-UK to change their Companies' registered agent from AMI Ex's counsel to a different individual and relocate their headquarters from Reston, Virginia, to Nashville, Tennessee. (*Id*. at ¶ 43). Throughout this period, Dr. Thomas Crabtree, who served as Chairman of AMI-US's board, persistently questioned the company's lack of transparency with its parent company, the significant funding it sought from AMI Ex, and the overall business acumen and vision of Cook and Watson. (*Id*. at ¶ 44). These inquiries caused friction between (on the one hand) Dr. Crabtree and (on the other hand) Cook, Andrew Walker, and Jack Walker, who, in October 2022, collectively removed Dr. Crabtree as Chairman. (*Id*. at ¶ 44). The three then decided to appoint Jack Walker as Dr. Crabtree's replacement as Chairman. (*Id*. at ¶ 47). Despite objections from Cook, Andrew Walker, and Jack Walker, Dr. Crabtree remained a member of the board. (*Id*. at ¶¶ 45-46).

In March 2023, Jack Walker proposed to the board of AMI-US a plan to issue 10,000,000 shares of AMI-UK stock without following the standard protocol of offering AMI Ex the preferred option to purchase the shares. (*Id.* at ¶¶ 48-49). Dr. Crabtree expressed concerns that the plan would significantly dilute AMI Ex's stake within AMI-UK and that, again, little to no disclosures of the

methodology behind the decision or future business plans were shared with the board or AMI Ex. (*Id.* at ¶¶ 50-56). AMI-US and AMI-UK continued asking AMI Ex for funding, which continued the familiar pattern of AMI Ex seeking information and business disclosures, and AMI-US and AMI-UK providing none. (*Id.* at ¶¶ 57-60). Dr. Crabtree continued his pursuit of insight into business decision-making and overall economic health, with the support of two other board members of AMI-US, Christine Joseph and Aaron Pait. (*Id.* at ¶¶ 61-62). The pursuit reached a head in the middle of April 2023, when Joseph and Pait resigned from the AMI-US board, due to what Plaintiffs perceived as a disagreement with the lack of transparency by AMI-US and AMI-UK with AMI Ex. (*Id.* at ¶ 63). Now lacking a quorum, the AMI-US board ceased to act. (*Id.* at ¶ 64).

### C.  Birth of Omnia LLC, and Termination of AMI-US/AMI-UK's Operations

Wanting to continue operations of AMI-US and AMI UK without AMI Ex's oversight, Cook and Watson created two new companies, Dauntless and Sahara Fire, respectively, to hold assets for a new, combined enterprise. (*Id.* at ¶¶ 60, 71). Cook submitted an expense report to AMI-US and AMI-UK to compensate him for the $806 incorporation cost for Dauntless, which was accepted and paid. (*Id.* at ¶¶ 67-68). On March 20, 2023, at Cook's direction, AMI-US's Head of Administration, Cook's sister (Gina Ross) set up Omnia with ownership split between Dauntless (Cook's LLC) and Sahara Fire (Watson's LLC). (*Id.* at ¶¶ 70-72).

Plaintiffs allege that Cook and Watson sought to commandeer for Omnia's use much of AMI-US/AMI-UK's infrastructure. (*Id.* at ¶¶ 73, 86, 90, 94). Plaintiffs point to two prominent AMI-US and AMI-UK clients, the Gates Foundation and OMV, whom they contend Cook and Watson successfully lured to Omnia. (*Id.* at ¶¶ 74, 81). In both cases, Cook and Watson gave the impression that Omnia would serve as a successor business to AMI-US and AMI-UK and that both

clients, who were undergoing contract negotiations with AMI-US and AMI-UK, should instead negotiate with Omnia for equivalent service and care. (*Id.* at ¶¶ 76-80, 83-85).

Cook also coordinated with AMI-UK's counsel to secure AMI-US's and AMI-UK's intellectual property, both for Cook and Watson's use and so that they could seek relief from trademark infringement should anyone trade under the official names of AMI-US or AMI-UK. (*Id.* at ¶¶ 86-87). Per Plaintiffs, Watson, Cook, Omnia, and Veritas are all using the intellectual property of AMI-US and AMI-UK. (*Id.* at ¶ 88). Cook and Watson also took additional efforts to poach AMI-US's and AMI-UK's employees for Omnia and use AMI-US's and AMI-UK's tangible resources for Omnia's benefit. (*Id.* at ¶¶ 91-97).

Once these efforts were complete, Cook and Watson informed AMI Ex that AMI-US and AMI-UK lacked proper funding and should shutter operations, which they did on June 1, 2023. (*Id.* at ¶¶ 100-101). Before this, however, Cook and Watson demanded that every user's information be deleted from AMI-US's and AMI-UK's servers to erase any digital footprint; upon erasure such information became irretrievable. (*Id.* at ¶¶ 102-104).

### D. Cover-Up and Aftermath

On June 12, 2023, AMI Ex learned of the deletion of information and hired consultants to attempt to retrieve the purged data. (*Id.* at ¶ 109). According to Plaintiffs, their consultants discovered Cook and Watson's actions, presented those discoveries to AMI Ex, and recommended that AMI Ex send a cease-and-desist letter to Omnia, Dauntless, Sahara Fire, Cook, and Watson. (*Id.* at ¶ 111). Andrew Walker, purportedly aware of these investigations, alerted Cook and Watson to AMI Ex's newfound awareness. (*Id.* at ¶ 112). As a result, Cook and Watson created Veritas and redirected all traffic from Omnia's website to Veritas's website. (*Id.* at ¶¶ 113-115).

Defendants' actions left AMI-US and AMI-UK unable to function, with no employees, no data, and no tangible benefits delivered to AMI Ex. (*Id.* at ¶ 116-118). In total, Plaintiffs report an investment of (at least) $4,407,493.42 in AMI-US and AMI-UK that returned nothing. (*Id.* at ¶ 119).

### E. Procedural History

Plaintiffs brought this shareholder derivative suit,[6] asserting (in Counts I-V) statutory claims against all Defendants. Specifically, in Counts I-V, respectively, Plaintiffs alleged violations of the Tennessee Uniform Trade Secret Act (Tenn. Code Ann. § 47-25-1701 *et seq.*, "TUTSA"), the federal Defend Trade Secrets Act (18 U.S.C. § 1836), the Lanham Act (15 U.S.C. §1125(a)), and the Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-101). Plaintiffs also asserted certain common-law claims against all Defendants. Specifically, in Counts VI, VII, VIII, X and XI, respectively, Plaintiff asserted claims for conspiracy to breach a fiduciary duty, intentional interference with existing or prospective business relationships, unfair competition, unjust enrichment, and conversion. In Count XI (which asserts not a cause of action but rather a request for a particular kind of relief), Plaintiffs requested a permanent injunction prohibiting all Defendants from using Plaintiffs' and AMI Ex's intellectual property and confidential information for their benefit. (*Id.* at ¶¶ 153-170, 175-190, 195-210).

In Count V, Plaintiffs assert claims against Cook and Watson jointly for breaches of a fiduciary duty and civil offenses under the Computer Fraud and Abuse Act (18 U.S.C. § 1030(a)

---

[6] With respect to the specific pleading requirements of Federal Rule of Civil Procedure 23.1(b)(3) for shareholder derivative actions, Plaintiff includes the allegations that: (i) before they brought this action, they did not make demand upon the directors of AMI Ex to bring this action on AMI Ex's behalf (Doc. No. 1 at ¶ 123); and (ii) the reason they did not make such demand is that so doing would have been futile "because there exists a reasonable doubt that only half of the Board at the time this Complaint was filed could properly exercise independent and disinterested business judgment in responding to a demand." (*Id.* at ¶ 124).

*et seq.*). (*Id.* at ¶¶ 148-152, 171-174). And Count IX asserts a claim against Cook individually for misappropriation of corporate funds. (*Id.* at ¶¶ 191-194).

Via these claims, Plaintiffs seek not only the aforementioned requested permanent injunctive relief, but also various damages and attorney's fees and costs. (*Id.* at ¶¶ a.- i.).

In response to the Complaint, Defendants filed the Motion, (Doc. No. 19), requesting dismissal of particular claims, namely Count VII for intentional interference with existing or prospective business relationships, Count VIII for unfair competition, Count X for unjust enrichment, and Count XI for conversion).[7]

## LEGAL STANDARD

The Court must take all factual allegations within the complaint as true when reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint that survives a motion to dismiss must contain sufficient allegations of factual matter, that when accepted as true, state a facially plausible claim. *Id.* Facially plausible claims are those that have sufficient factual content such that a court may draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *Id.*

On the other hand, well-pled factual allegations allow the court to assume their veracity and then determine whether they plausibly give rise to an entitlement of relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v.*

---

[7] Via their Memorandum, Defendants additionally request dismissal of the claim (Count V) against Cook and Watson for violating the Computer and Abuse Act. (Doc. No. 19 at 3). However, Count V was not mentioned in the Motion itself. In any event, Defendants have conceded in the Reply that Plaintiffs have adequately alleged facts to proceed on this claim against Cook and Watson. (Doc. No. 28 at 5). And for this reason, the Court considers the issue moot and will not address this claim further herein.

*Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), (cited in *Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely consistent with the defendant's liability do not satisfy the plaintiff's burden, as mere consistency does not establish the plausibility of entitlement to relief even if it supports the possibility of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief, including any "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. Then, the question is whether the remaining allegations plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

When a motion to dismiss is based on purported preemption of claims, though, most of the above-stated familiar principles regarding Rule 12(b)(6) motions actually are inapplicable. Such a motion is grounded not on the plaintiff's alleged failure to include factual matter that plausibly suggests that the claims are valid, but rather on the plaintiff allegedly having included factual matter that clearly shows that the claims are preempted. *See Pardini v. Unilever United States, Inc.*, 65 F.4th 1081, 1084 (9th Cir. 2023) ("A complaint may be dismissed when the allegations of the complaint give rise to an affirmative defense that clearly appears on the face of the pleading." Preemption, on which the defendant bears the burden, can be such a defense.") (citations and internal quotation marks omitted).

One above-stated principle that remains applicable, even on such a motion, is that the court must construe the allegations of the complaint in plaintiffs' favor. (*Id.*) So to the extent that a complaint reasonably can be construed in a way that that helps a claim avoid the preemption that is asserted in such a motion, the complaint must be construed that way.

<u>DISCUSSION</u>

In cases where the federal courts hear claims anchored in state law, under the so-called *Erie* doctrine, federal courts should apply the appropriate state law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 77 (1938). To determine which state's substantive law the federal court should base its decision on, federal courts should follow the conflict-of-laws rules of the state in which that federal court sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941). The parties do not dispute that in this case, the Court should apply Tennessee substantive law to all counts challenged via Defendant's Motion.

Here, Defendants challenge four claims: Count VII (Intentional Interference with Existing or Prospective Business), Count VIII (Unfair Competition), Count X (Unjust Enrichment), Count XI (Conversion). (Doc. No. 19 at 4). Defendants contend that all of them are preempted by the Tennessee Uniform Trade Secret Act (TUTSA), (*Id.* at 1), and that Count XI, alternatively, is subject to dismissal for failure to state a claim. (*Id.* at 9-10).

TUTSA "was adopted in 2000 to establish a comprehensive statutory scheme to govern the definition of trade secrets and to protect against their misappropriation." *Wachter, Inc. v. Cabling Innovations, LLC*, 387 F. Supp 3d 830, 845 (M.D. Tenn. 2019). In concrete terms, TUTSA allows aggrieved individuals to seek either injunctive relief or damages when another person misappropriates trade secrets that the aggrieved individuals control to their detriment. Tenn. Code Ann. §§ 47-25-1703(a) and 1704(a).

Under TUTSA, "misappropriation" can include the:

(A) Acquisition of a trade secret of another by a person[8] who knows or has reason to know that the trade secret was acquired by improper means; or
(B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (i) Used improper means to acquire knowledge of the trade secret; or
> (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
> (a) Derived from or through a person who had utilized improper means to acquire it;
> (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

Tenn. Code Ann. §§ 47-25-1702(2)(A), (B)(i)-(ii). "Misappropriation" of the second kind (i.e., *disclosure* as opposed to *acquisition*) also can occur when the discloser "knew or had reason to know that [the information disclosed] was a trade secret," acquired the information accidently or mistakenly, and had not yet materially changed their position. Tenn. Code Ann. § 47-25-1702(2)(B)(iii).

Per the Tennessee Code, a "trade secret" is:

"Trade secret" means information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:

(A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702(4). Tennessee courts have interpreted this language to cover both what common law would consider a "trade secret" and what would commonly be known as simply

---

"confidential information." *Wachter, Inc.*, 387 F. Supp 3d at 845-846 (citing *Hamilton-Ryker Grp., LLC v. Keymon*, No. W2008-936-COA-R3-CV, 2010 WL 323057, at \*13 (Tenn. Ct. App. Jan. 28, 2010).[9] But to be clear, however broadly TUTSA's definition of "trade secret" is interpreted, TUTSA protects only information that falls within the definition provided above.

TUTSA expressly preempts all remedies (except those prescribed by TUTSA) as to claims involving trade secrets except for: (1) contractual remedies; (2) civil remedies "not based upon misappropriation of a trade secret"; or (3) criminal remedies. Tenn. Code Ann. §§ 47-25-1708(a) & (b). The Tennessee Supreme Court has not spoken definitively on how broadly to interpret TUTSA's preemption, but federal courts (including this Court) and lower Tennessee courts have taken up this issue on numerous occasions and coalesced around a particular view that this Court finds persuasive.[10]

---

[9] TUTSA's definition of "trade secrets" is broader than the definition in the UTSA. *See Wachter*, 387 F. Supp. 3d at 845-846.

[10] In citing cases herein to identify or explain its view as to what Tennessee law is on a particular topic or issue, the Court is mindful that under the *Erie* doctrine, the Court should not necessarily accept that a court's prior statement of Tennessee law accurately reflects current Tennessee law. "Under the *Erie* doctrine, a federal court sitting in diversity applies 'the substantive law of the forum state and federal procedural law.'" *Bonasera v. New River Elec. Corp.*, 518 F. Supp. 3d 1136, 1151 (S.D. Ohio 2021) (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)).

The Sixth Circuit has explained:

> In diversity cases such as this, [the *Erie* doctrine requires that] we apply state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the [state] Supreme Court would decide otherwise."

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) (citations and footnote omitted) (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995)). Herein, when the Court cites a decision of a state or federal court stating some view grading Tennessee law, it does so with confidence that the Tennessee Supreme Court today would not decide differently with respect to the cited proposition(s).

That view materializes in *Hauck Mfg. Co. v. Astec Industries, Inc.*, 375 F. Supp. 2d 649, 658 (E.D. Tenn. 2004), wherein the Eastern District of Tennessee agreed with an approach taken by other courts—dealing with various state versions of the Uniform Trade Secrets Act ("UTSA")[11] like TUTSA—known as the "same proof" standard. In their words:

> [I]f proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it. [*See Smithfield Ham & Prods. Co. v. Portion Pac,* 905 F. Supp. 346, 350 (E.D Va. 1995)] ("The question is . . . whether failure of the misappropriation claim would doom the remaining counts as well."). The UTSA defines "misappropriation" broadly enough to cover a wide range of conduct, including the sort of conduct contemplated by the various claims which are often involved in preemption disputes. If a proven claim, whether in whole or in part, constitutes misappropriation of trade secret, it is that and that alone.

*Hauck Mfg. Co.*, 375 F. Supp. 2d at 658.[12] There is another way to think of this principle, drawing on the criminal-law concept of "lesser-included offense:[13] if a claim under [T]UTSA would be a

---

[11] Herein, the Court uses "[T]UTSA" when referring simultaneously to both the UTSA and to its Tennessee version (TUTSA) in particular.

[12] To more easily grasp what *Hauck* is saying here, it helps to keep in mind a few things. First, [T]UTSA uses the defined term "misappropriation," rather than "misappropriation of trade secrets," but the term "misappropriation" is defined in terms solely of wrongful conduct with respect to trade secrets. Second, and as a result, in the context of [T]UTSA, there is no difference between speaking of a claim of "misappropriation" and speaking of a claim of "misappropriation" of "trade secrets"; in the [T]UTSA context, the two terms are interchangeable, and indeed such interchangeability may be reflected in this opinion. Third, a claim for "misappropriation" of "trade secrets" (as those respective terms are broadly defined by the UTSA and especially TUTSA) is a [T]UTSA claim, and for conduct to violate [T]UTSA, it must fit within the definition of "misappropriation" (as broadly defined by [T}UTSA) of "trade secrets" (as broadly defined by [T}UTSA). So in the context of discussions (like *Hauck*'s) of the "same proof" rule, to speak of a claim of misappropriation of trade secrets is to speak of a claim of a violation of [T]UTSA, and vice versa.

[13] As explained by the Supreme Court in the context of Federal Rule of Criminal Procedure 31(c), a criminal offense is a lesser-included offense of another criminal offense if its elements are a subset of the other offense. *See Carter v. United States*, 530 U.S. 255, 260 (2000).

"lesser-included claim" vis-à-vis another kind of claim (the "greater claim"), then that other kind of claim is preempted by the [T]UTSA.[14]

Both the Tennessee Court of Appeals and the Sixth Circuit have found the "same proof" test workable and well-reasoned. *See Ram Tool & Supply Co. v. HD Supply Const. Supply, Ltd.*, No. M2013-02264-COA-R3CV, 2014 WL 4102418, at *12 ("However, we find persuasive and instructive the thorough and well-reasoned analysis set forth by the United States District Court for the Eastern District of Tennessee in the case of *Hauck Manufacturing Company . . ..*" (footnote omitted)) (Tenn. Ct. App. Aug. 19, 2014), *appeal granted, cause remanded on other grounds* (Nov. 24, 2015); *see also PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 976 (6th Cir. 2007) (referring to the "well-reasoned *Hauck* decision").

This Court on multiple occasions has followed the *Hauck* decision and its "same proof" standard in cases involving TUTSA preemption disputes. *See Wachter, Inc.*, 387 F. Supp 3d at 845; *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 963 (M.D. Tenn. 2011). Given the extent of concurrence within the district, the state, and the circuit, this Court herein will apply the "same proof" standard—not least because the Court is confident that this approach comports with the *Erie* doctrine. *Id.* at 963 (M.D. Tenn. 2011) ("The Court will apply that test because it is reasonably likely that, if presented with the issue, Tennessee courts would apply the 'same proof' test in determining whether claims are preempted by the TUTSA."); *J.T. Shannon Lumber Co.,*

---

[14] Though useful, the analogy to the notion of lesser-included offense is inexact. The test for lesser-included offense is an "elements test"; as noted in *Carter*, it involves "a textual comparison of the criminal statutes," which is to say a comparison of the elements of the two criminal statutes—the one prescribing the purported lesser-included offense and the one prescribing the purported greater offense—as revealed by their respective text. *Id.* The "same proof" test involves a comparison not of the *elements* of the two claims, but rather of the *facts* necessary to establish the two claims—a comparison that (as is important but often goes unsaid) at the motion-to-dismiss stage is based on what *the complaint*'s *allegations* reveal about what alleged facts the plaintiff relies on to establish the respective claims.

2010 WL 3069818 at *11 ("[T]he Court agrees with the Eastern District of Tennessee that if confronted with the issue of TUTSA preemption, Tennessee courts would apply the 'same proof' test").

The Court notes that it when it says it will apply the "same proof" test, it means it. Herein, a claim will be ruled preempted, if at all, based only on the "same proof" test; perhaps contrary to what some courts (even if seemingly applying the "same proof" test) have done, it will not find a claim preempted merely on some more general notion that the claim somehow *involves* or *is related to* trade secrets (or other information protected by [T]UTSA).

In the present case, Defendants argue that each of the four claims at issue is preempted by TUTSA because (according to Defendant) the establishment of each such claim necessarily would establish a TUTSA claim. (Doc. No. 19 at 4). The Court will consider in turn each of the four counts as to which dismissal is sought via the Motion.

a. Intentional Interference with Existing or Prospective Business Relationships Claim (Count VII)

To recover for intentional interference with existing or prospective business relationships in Tennessee, a plaintiff must prove that: (1) there was an existing relationship between themselves and specific third parties or a prospective relationship with an identifiable class of third parties; (2) the defendant must know of the relationship, not simply be "merely aware" of the relationship; (3) the defendant intended to cause the relationship's breach or termination; (4) the defendant used improper means or motive to accomplish the task; and (5) they suffered an injury as a result of the defendant's conduct. *Watson's Carpet & Floor Covering, Inc. v. McCormick*, 247 S.W.3d 169, 176-177 (Tenn. Ct. App. 2007) (citing *Trau-Med of America, Inc. v. Allstate Insurance Co.*, 71 S.W.3d 691, 701 (Tenn. 2002)).

Defendant correctly notes that "[insofar] as the 'improper motive or improper means' stems from the 'same-proof,' Plaintiffs' claim is preempted." (Doc. No. 19 at 6). This is true as far as it goes—which is to say that *to the extent that* the alleged improper means *includes conduct that would amount to (rise to the level of) a violation TUTSA* ("TUTSA-violating conduct") and thus support a claim under TUTSA, Count VII would be preempted. But Defendants do not point out where Count VII alleges that the improper means includes TUTSA-violating conduct—or, for that matter, even conduct that would merely *go towards* a violation of TUTSA without by itself rising to the level of a violation of TUTSA ("TUTSA-implicating conduct").

Nor could Defendants possibly have pointed out any such thing. That is because Count VII alleges only a single improper means: "convincing the Companies' customers to cease doing business with the Companies and instead conduct business with Omnia and/or Veritas in an effort to harm the Companies and AMI Ex." This improper means by no means necessarily includes TUTSA-violating conduct (or even TUTSA-implicating conduct). So the claim is not preempted under the "same proof" test. Defendants' arguments to the contrary rely essentially on construing the Complaint against Plaintiff so as to treat this count as implying that the improper means included TUTSA-violating conduct. But the Court declines to give Count VII such treatment because it must construe the Complaint in Plaintiffs' favor.

To be clear, the Court is not saying that the factual allegation of Defendants' improper means—i.e., merely convincing a company's customers to switch their business to another companies—would have been found sufficient to plausibly suggest that Defendants had in fact used "improper means" as required to establish the claim in Count VII. But Defendants did not

raise the sufficiency of this allegation, and the Court will not do so *sua* sponte. So the Motion is denied with respect to Count VII.[15]

b. <u>Unfair Competition Claim (Count VIII)</u>

Unfair competition is something of a catch-all claim for "several related torts involving improper interference with business prospects." *RN Ent., LLC v. Clement*, 380 F. Supp. 3d 711, 721 (M.D. Tenn. 2019) (quoting *J.T. Shannon Lumber Co. v. Barnett*, No. 2:08-cv-2847, 2010 WL 3069818, at *13 (W.D. Tenn. Aug. 4, 2010). Though the parameters of such claims are somewhat nebulous, Tennessee courts recognize unfair competition claims when a plaintiff shows "conduct that amounts to a recognized tort, and when the tort deprives the plaintiff of customers or other prospects." *FTA Enters. Inc. v. Pomeroy Comput. Res., Inc.*, No. E2000-01246-COA-R3-CV, 2001 WL 185210, at *5 (Tenn. Ct. App. Feb. 12, 2001). Thus, a plaintiff must allege and prove a separate underlying tort to substantiate a claim for unfair competition. *Id.*

Construing the instant Complaint in favor of Plaintiff as required, the underlying tort is intentional interference with existing or prospective business relationships, as alleged in Count VII. As noted above, nothing about Plaintiffs' allegations concerning that alleged underlying tort— or Plaintiffs' closely related assertion, necessary for a claim of unfair competition, that the tort resulted in deprivation of Plaintiff of customers or other prospects—refer to or necessarily concern TUTSA-violating conduct (or even TUTSA-implicating conduct). Therefore, this claim is neither preempted nor subject to dismissal for failure to adequately allege the elements of unfair

---

[15] On the other hand, the Court wishes to make quite clear: Plaintiffs, having side-stepped a preemption challenge by making a single allegation as to the "improper means," will be held to that allegation and will not hereafter be permitted to support Count VII by alleging other kinds of alleged improper means, *including* Defendants allegedly engaging in TUTSA-implicating or TUTSA-violating conduct. He Court likewise will hold Plaintiff to its allegations (and the limitations thereof) with respect to each of the other three counts allegedly (but not actually) preempted by TUTSA

competition, because it was not challenged on that basis. So the Motion is denied with respect to Count VIII.

c. <u>Unjust Enrichment Claim (Count X)</u>

Though unjust enrichment is generally seen as quasi-contractual, Tennessee courts have emphasized that quasi-contractual remedies are not co-equal with contractual remedies. *See Kalos, LLC v. White House Vill., LLC*, No. M2023-01325-COA-R3-CV, 2024 WL 4579299, at *2 (Tenn. Ct. App. Oct. 25, 2024) (implying that since "a plaintiff must first exhaust any contractual remedies it may have" before pursuing a claim of unjust enrichment, unjust enrichment is not seen as contractual). Since unjust enrichment is not contractual, TUTSA permits preemption of such claims where appropriate. Tenn. Code Ann. §§ 47-25-1708(b).

Under Tennessee law, unjust enrichment occurs when: (1) the plaintiff confers a benefit upon the defendant, which (2) the defendant appreciates, under such circumstances (3) where acceptance without payment of the value of the benefit would be inequitable. *Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966)).

Plaintiffs' claim for unjust enrichment is preempted in part under TUTSA. Plaintiffs allege that both Cook and Watson had access to and benefited from AMI-US's and AMI-UK's "customers, employees, information, and funds." (*Id.* at ¶ 196-198). This implicates the information that Plaintiffs admit in paragraph 154 of the Complaint are trade secrets: "customer lists, sales strategy and tactics, proprietary information regarding pricing and billing records, knowledge of the Companies' customer needs, the Companies' products and services and other knowledge, forms and procedures used in the business." Similarly, Plaintiffs claim that the benefits Cook and Watson enjoyed from the enrichment stemmed from action including "stealing . . .

customers information for [the use of Cook and Watson] through companies they either own or control[.]" (*Id.* at ¶ 198).

In this respect, the claim for unfair competition in Count X is a greater tort (because a TUTSA claim is lesser-included claim. Thus, TUTSA preempts Count X to the extent that it is based on alleged misappropriation or "spoliating" "documents" or "information" (Doc. No. 1 at ¶ 196, 198) of the kind described in paragraph 154 of the Complaint, including "customer lists," *id., or other* "customers [sic] information," (*id.* at ¶ 198).

To the extent that Count X is based on "using the Companies' funds for their own use," it is plainly not a greater tort (because a TUTSA claim plainly is not a lesser-included claim). Thus, not having been challenged via the Motion on any other basis, Count X survives to that extent.

### d. Conversion (Count XI)

To recover on a claim of conversion, a plaintiff must prove that: (1) the defendant appropriated the plaintiff's property for personal use and benefit, (2) through the defendant's intentional exercise of dominion over it, (3) against the rights of the legal owner. *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (citing *Kinnard v. Shoney's, Inc.*, 100 F. Supp. 2d 781, 797 (M.D. Tenn. 2000)) (citing *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977)).

Plaintiffs' primary assertion and basis for conversion appears at first glance to focus on their allegations that Defendants appropriated AMI-US's and AMI-UK's funds for their use in growing Omnia and Veritas. (Doc. No. 1 at ¶ 202). However, Plaintiffs contend that Cook and Watson "used [AMI-US's and AMI-UK's] *information*," along with funds to form the basis of their

conversion claim and broadly cite the rest of the Complaint when defining what "information" of which they speak. (*Id.*) (emphasis added).

The same analysis set forth with respect to Count X likewise governs here. Count XI is a greater tort (because TUTSA is a lesser-included claim) to the extent that the claim is based on Defendants' "us[ing] . . . information," (*id.*), of the Companies that is within the scope of paragraph 154 of the Complaint, and it is therefore pre-empted to that extent.[16] But to the extent it is based on Defendants' [us]ing" the Companies' funds," (*id.*), it plainly is not a greater tort (because a TUTSA claim plainly is not a lesser-included claim). Thus, to that extent, Count XI is not preempted.

However, Defendants alternatively claim that Count XI otherwise fails to state a claim because conversion of funds is a cognizable tort only when the funds are "specific and capable of identification." (*Id.* at 8-9) (quoting *Knox Trailers, Inc. v. Maples*, 581 F.Supp.3d 1000, 1017 (E.D. Tenn 2022)). "Defendants are correct that Tennessee law does not recognize a cause of action for the conversion of intellectual or intangible property." *Id*. And "[m]oney is generally considered to be an intangible." *Id.* Thus, an action for conversion of "funds," i.e.*,* money, generally is not cognizable:

> However, "there is an exception where the money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose." *Id.* "Identifiable funds are deemed a chattel for purposes of conversion," and "conversion of checks is actionable because checks designate specific amounts of money for use for specific purposes." *Id.* A plaintiff must identify these specific funds in his or her complaint. *Humana, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 133 F. Supp. 3d 1068, 1074 (W.D. Tenn.

---

[16] As to this aspect of Count XI, Defendants argue *only* preemption, even though their citation to *Wachter* suggests that they *could have* argued that it failed to state a cognizable claim. *See* (Doc. No. 19 at 8). (" In so far [sic] as the information was utilized by the conduct set forth above' (i.e., by the misappropriation of trade secrets), TUTSA preempts such a claim. Dkt. No. 1, ¶ 202; *Watcher,* [sic] *Inc.*, LLC., 387 F.Supp.3d at 848 (M.D. Tenn. 2019) ("Tennessee law does not recognize an action for the conversion of intellectual property")). So as to this aspect of Count XI, the Court addresses only whether the claim is preempted by TUTSA.

2015) (dismissing conversion claim when plaintiff had not identified specific funds in the complaint); *Bluff City*, 387 S.W.3d at 554–55.

*Knox Trailers, Inc.*, 581 F.Supp.3d at 1017. Defendants contend that the only specific funds identified by Plaintiffs is the "$806 in costs to establish Dauntless LLC," (Doc. No. 19 at 9) (quoting Doc. No. 1 at ¶ 67), which was subsequently claimed by (one or more) Defendants in an expense report and thereafter paid by the Companies. (Doc. No. 1 at ¶ 68). Plaintiff does not dispute this contention, (Doc. No. 24 at 18-19), and it appears accurate from a review of the Complaint. But Plaintiff does argue in effect that, contrary to Defendants' argument, the fact that the $806 was subsequently approved for payment by the Companies does not defeat the claim as a matter of law at this early juncture. (Doc. No. 24 at 19). The Court agrees, finding no legal or factual basis for dismissing this claim on the grounds that the Companies happened (for whatever reasons and under whatever circumstances, which are not identified in the Complaint) to approve the expense report before paying the $806.

The Court adds two caveats here, however. It is possible that, as Defendants suggest but do not adequately support at this juncture, (Doc. No. 28 at 4-5), that when funds are obtained via payment of an approved expense report (even a misleading and/or fraudulent one), the particular elements of conversion cannot be met no matter how generally wrongful the submission of the expense report may have been. The Court has not rejected this theory, but rather instead finds it merely undeveloped by Defendants. Second, although the claim for conversion of funds is deemed to survive the Motion in full, that claim shall be limited to the aforementioned $806 because that is that full amount adequately claimed via Count XI.

## CONCLUSION

For the reasons and with the caveats stated herein, the Motion (Doc. No. 18) will be GRANTED IN PART AND DENIED IN PART. Specifically, (i) with respect to Count X and Count

XI the Motion will be **granted** to the extent (but only to the extent) indicated herein, and (ii) with respect to Counts VII and VIII, the Motion will be **denied**.

An appropriate accompanying order shall be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE